# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PHILLIP KAREEN GREEN,

    Petitioner,

    v.                             Case No. 17-CV-1243

WILLIAM POLLARD,

    Respondent.

## DECISION AND ORDER DENYING PETITION FOR
## WRIT OF HABEAS CORPUS

    Phillip Kareen Green, a prisoner in Wisconsin custody, was convicted in Milwaukee County Circuit Court of first-degree reckless homicide while armed. (Judgment of Conviction, Answer to Habeas Petition ("Answer"), Docket # 19-1.) He was sentenced to thirty years of imprisonment consisting of eighteen years of initial confinement followed by twelve years of extended supervision. (*Id.*) He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 arguing that his conviction is unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

    On the evening of May 24, 2013, and into the early morning hours of May 25, 2013, four men—Green, Nicklaus Gordon, Johntel Henderson, and Ernest Banks—went out to several bars. (*State v. Green*, Appeal No. 2015AP1126 (Wis. Ct. App. Apr. 26, 2016), Answer, Docket # 19-5 at 2.) What was supposed to have been a fun night out ended with a fight between Green and Banks and ultimately with Green fatally shooting Banks. (*Id.*)

As the court of appeals noted, during the jury trial, several witnesses presented different versions of the events. (*Id.*) Gordon testified that although the four men did not arrive at the first bar in the same car, ultimately, they all ended up riding in Gordon's truck during the evening, with Banks driving, Henderson in the front passenger seat, Green sitting behind Banks, and Gordon sitting behind Henderson. (Transcript of Jan. 7, 2014 – A.M. Jury Trial, Answer, Docket # 19-11 at 9–19.) After going to several bars, the men decided to go to Ricky's, a strip club. (*Id.* at 17.) After arriving, Banks and Henderson briefly entered the club and then exited, while Gordon and Green remained in the truck. (*Id.* at 17–18.) Banks and Henderson returned to the truck and Banks stated that they were going to go to the Cheetah Club, another strip club. (*Id.* at 18.)

Green indicated more than once that he did not want to go and asked to be taken back to his car. (*Id.* at 18.) Gordon recalled Banks saying, "If you go home, I'm going to go home too." (*Id.*) Gordon testified that from that point, Green and Banks began arguing loudly and that he and Henderson tried to calm the other two men down. (*Id.* at 21.) Gordon testified that after a couple of seconds, Banks pulled the truck over (*id.*), got out, and opened Green's door (*id.* at 24). Gordon was unsure whether Green stepped out of the vehicle on his own or how, exactly, he exited the truck. (*Id.*) At some point Henderson also exited the vehicle, as did Gordon, who crawled out Green's side of the truck. (*Id.*) Gordon saw Banks throwing a punch at Green. (*Id.* at 25.) Henderson tried to grab Banks and Gordon tried to grab Green. (*Id.*) Gordon testified that they separated them for a few seconds, but they both got loose again. (*Id.*) Although Gordon stated that the two men were "going at each other," he testified that he did not ever see Green throw a punch. (*Id.* at 25–26.)

Gordon observed Green get hit two or three times and eventually fall to the ground. (*Id.* at 27.) Gordon and Henderson again unsuccessfully tried to separate the men. (*Id.*) Gordon testified that after Green fell to the ground, Banks kicked Green in the back and then "backs up like in a boxing stance." (*Id.* at 28.) Gordon stood in front of Green facing Banks, trying to block Green. (*Id.* at 29.) Henderson stood to the side of Banks trying to calm him down. (*Id.*) Gordon testified that after four or five seconds he heard a pop over the right side of his ear and, believing it to be a gunshot, began running backwards. (*Id.* at 31.) Gordon saw Banks extend his arms out but did not see him fall as he had turned to run. (*Id.* at 32.)

Henderson testified that he knew Banks through work and that he was his friend. (*Id.* at 75–76.) He knew Gordon through Banks and from the gym. (*Id.* at 76.) Henderson had not met Green before that night. (*Id.* at 77.) Henderson's account of the early night's events was like Gordon's up until the time that a decision was reached to go to the Cheetah Club. (*Id.* at 79–85.) Henderson similarly testified that Green asked to go to his car (*id.* at 86), but contrary to Gordon's testimony, Henderson stated that it was he who stated that if Green went to his car, he was going to go home too "because [Green's] car was parked in front of [Henderson's] house" (*id.* at 87). Henderson explained that if they were going to go all the way back to his house, there was no reason for him to go back out. (*Id.*)

Henderson testified that Gordon persuaded Green to stay out with them. (*Id.*) Henderson testified that on the way to the strip club, Green and Banks began arguing over which strip club had "better accommodations." (*Id.*) Henderson recalled both Green and Banks getting heated and the men getting loud with each other and engaging in name calling. (*Id.* at 88–89.) Banks pulled the truck over, jumped out of the vehicle, and opened

Green's door. (*Id.* at 89–90.) Henderson testified that Green got out of the vehicle and the two men were "nose to nose," arguing back and forth. (*Id.* at 90.)

Henderson stated that he exited the vehicle and grabbed Banks and put him inside the driver's seat, trying to calm him down. (*Id.*) However, Green continued to mouth off and before Henderson knew it, Banks and Green were back nose-to-nose with each other. (*Id.* at 91.) The two men started fighting and, according to Henderson, then started swinging and Banks hit Green, who lost his balance and fell to the ground. (*Id.* at 92.) Henderson testified that Banks kicked Green in the back while he was on the ground. (*Id.*) Henderson recalled that he was trying to restrain Banks and Gordon was trying to restrain Green. (*Id.* at 93.)

Henderson testified that Gordon was between Green and Banks. (*Id.* at 94.) Unlike Gordon's testimony, Henderson stated that he saw both men throw punches. (*Id.* at 95.) While trying to restrain the men, Henderson testified that Banks pulled away from Henderson and stood in a boxing stance. (*Id.* at 97.) Henderson testified that Gordon was still between Green and Banks when he saw Green reach over Gordon and shoot Banks. (*Id.*) Henderson ran. (*Id.*) On cross-examination, Henderson testified that during the fight, Green had his vest pulled over his head by Banks, but Banks was not striking him at that time. (*Id.* at 113–14.)

Green testified in his own defense at trial. Green explained that he had a concealed carry permit for the gun that was used in the shooting. (Transcript of Jan. 7, 2014 – P.M. Jury Trial, Answer, Docket # 19-12 at 28.) On the night in question, Green testified that Gordon asked him to meet him at a bar called Dale's. (*Id.* at 32.) Green was unaware that Gordon was with anyone else at the bar. (*Id.*) Upon arriving, Green saw Banks and

Henderson. (*Id.*) The four men stayed at Dale's for approximately twenty minutes and Green had one beer. (*Id.* at 32–33.) Green testified that Gordon suggested going to the strip club while at Dale's, and Green said no. (*Id.* at 33.) After leaving Dale's, Green testified that they went to 502 (another bar) because Green's fiancée was there celebrating Green's cousin's birthday. (*Id.*) Green testified that Banks insisted on the four men riding together, even though Green had stated that he would just meet them all there. (*Id.* at 34.)

Green testified that the four men were at 502 for approximately twenty-five to thirty minutes when Gordon told Green that they were leaving. (*Id.* at 37–38.) Green stated that the other men wanted to go to a strip club, but Green told Banks that he wanted to return to his car because he had to work in the morning. (*Id.* at 38.) Green stated that Gordon persuaded him to go along and not return to his car. (*Id.*) Green testified that the four men initially drove to Ricky's. (*Id.* at 39.) All four men exited the vehicle; Banks and Henderson went to the door while Gordon and Green were still by the truck waiting to cross the street. (*Id.*) Green testified that he looked and saw Banks and Henderson returning to the truck, so he got back into the vehicle. (*Id.*)

After the four men returned to the truck, Banks began driving. (*Id.* at 40–41.) Green testified that Banks stated, "Fuck this shit. I'm going to the Cheetah Club," to which Green responded that he wanted to return to his car. (*Id.* at 41.) Green testified that Banks responded, "Ain't nobody going to keep - - ain't nobody going to be doing all this shit, you're going with us." (*Id.*) Green asked Gordon what was wrong with his friend, to which Banks responded that he was going "to beat [Green's] ass." (*Id.*) Green testified that Banks stated that he wanted "to beat [Green's] ass anyway" and "as a matter of fact, [Banks was]

going to beat [Green's] ass now." (*Id.*) Green testified that it was at this point Banks pulled the truck over. (*Id.*)

Once the vehicle stopped, Green testified that Banks got out, opened Green's door, and started pulling Green out of the truck by his shirt. (*Id.* at 42.) Outside of the truck, Banks hit Green and Green moved to the rear of the vehicle, where Banks punched him several times. (*Id.*) Green testified that he used his hand to try to maneuver away from Banks, at which time Banks pulled Green's vest over his head, obstructing his view. (*Id.* at 42–43.) Green testified that he could feel Banks on him, punching him, while Green tried to take his vest from his head. (*Id.* at 43.) Green had his right hand on his gun because he did not want Banks to take it. (*Id.*) Green testified that he was trying to get up, but Banks "swung [him] down, punching [him]." (*Id.*) Green was on one knee with Banks pulling him towards him. (*Id.*) Green ended up on his back. (*Id.*)

Green testified that Gordon was on Green's left, standing sideways, while Banks was three feet in front of him. (*Id.* at 44.) As Green was getting up from the ground, he saw Banks coming towards him. (*Id.*) He did not see Henderson anywhere. (*Id.* at 45.) Green pulled his gun out of its holster, put it upward, and shot it. (*Id.*) Green testified that he felt threatened for his life and that he never punched Banks or ever had his hands on him. (*Id.*) Green testified that he saw Banks stumble back and fall and he saw Gordon jump in the truck and pull off. (*Id.* at 46–47.) Green then took out his phone and called the police, explaining that he had just shot someone. (*Id.* at 47.) Green stayed at the scene until the police arrived. (*Id.* at 48.)

Contrary to Gordon and Henderson's testimony, Green testified that he did not remember seeing Banks in a boxing stance and instead saw Banks coming at him. (*Id.* at 59–

60.) Green also testified that he did not shoot his gun over Gordon and in fact Gordon was never standing between Green and Banks. (*Id.* at 60.) Green testified that he did not remember Gordon trying to hold him back or Henderson trying to hold Banks back; rather, no one tried to break up the fight at any point. (*Id.* at 67–68.)

On cross-examination, Green admitted telling a detective that he punched Banks and conceded that during an earlier interview, he never told detectives that Banks was "coming at him" when he shot Banks. (*Id.* at 54, 69–70.)

Shaquita Glover, who lived across the street from where the incident took place, also testified. (Transcript of Jan. 6, 2014 – P.M. Jury Trial, Answer, Docket # 19-10 at 68.) Glover heard a car, music, and several men arguing and hollering. (*Id.* at 73.) Glover initially did not think anything of it, but was drawn to her window when she heard a man say, "Let me go. Let me go." (*Id.* at 75.) Glover testified that she observed two men "tussling" and two other men trying to break up the fight. (*Id.* at 76.) Although Glover was not close enough to see the individuals' faces, she was able to generally describe Banks as wearing a red shirt and Green as wearing a vest. (*Id.* at 77.)

Glover testified that Banks was really loud and that Green was pulling Banks and Banks was trying to get away from Green. (*Id.* at 78–79.) Glover did not remember seeing anyone get punched, though she saw Banks throw a punch at Green. (*Id.* at 81, 92.) On cross-examination, Glover acknowledged that Green was not that aggressive and did not seem to be the one causing the problem. (*Id.* at 93.) At the time Banks was shot, Glover testified that the four men were standing very close to each other, almost in a huddle, when she heard a pop and saw Banks fall to the ground. (*Id.* at 99.) Glover testified that Green kept saying "Get off me," even after Banks fell to the ground. (*Id.* at 103.)

Detective Yvette Panfil testified that she took pictures of Green the afternoon of May 25. (Docket # 19-12 at 5, 9.) Detective Panfil testified that Green had visible redness on his back, but no other major injuries besides some redness and minor abrasions. (*Id.* at 6–7.) The State also introduced evidence of security camera footage from a nearby building. (Docket # 19-10 at 106.) Although the video did not capture the entire incident, it did reflect that the entire incident took place in one minute and twenty-two seconds. (*Id.* at 107–15.)

Finally, the medical examiner testified that Banks died from a gunshot wound to the head. (Docket # 19-11 at 127.) She testified that the bullet's trajectory was front to back, left to right, and upward; however, she could not state what position the body was in when the gunshot wound occurred or exactly where the gun was located when fired. (*Id.* at 128–29.) The medical examiner estimated that the gun's muzzle was eighteen to twenty-four inches from the skin's surface when it was fired, based on the stippling seen on Bank's wounds. (*Id.* at 131.)

Green argued that he acted in self-defense or, alternatively, that his conduct did not show that his actions demonstrated utter disregard for human life, a necessary element of first-degree reckless homicide. (Transcript of Jan. 8, 2014 – A.M. Jury Trial, Answer, Docket # 19-13 at 26–30.) In addition to submitting to the jury the instruction for first-degree reckless homicide, the court submitted the instruction for second-degree reckless homicide (which does not include as an element utter disregard for human life), as a lesser-included offense. (*Id.* at 3–11.) The court also instructed the jury on self-defense. (*Id.* at 5–9.) The jury convicted Green of first-degree reckless homicide. (Transcript of Jan. 8, 2014 – P.M. Jury Trial, Answer, Docket # 19-14 at 3–6.)

Green filed a post-conviction motion for relief arguing that the evidence was insufficient to support his conviction because it did not show that he acted with utter disregard for human life. (Docket # 19-2 at 2.) Green also sought discretionary reversal in the interests of justice pursuant to Wis. Stat. § 752.35, arguing that the real controversy was not fully tried because the jury instructions failed to explain that imperfect self-defense would negate a finding of utter disregard for human life and because the jury was not given a full picture of Green's fear of Banks that night. (*Id.* at 20–26.)

The circuit court denied Green's motion, and Green appealed, raising the same issues. (Docket # 19-2, Docket # 19-4.) The court of appeals affirmed (Docket # 19-5) and the Wisconsin Supreme Court denied Green's petition for review (Docket # 19-8). Green filed a timely petition for habeas review in this Court, alleging the same two claims brought in state court, as well as an ineffective assistance of counsel claim. (Docket # 1, Docket # 10.) Green conceded that his ineffective assistance of counsel claim was not exhausted and moved to stay and hold his petition in abeyance. (Docket # 1 at 8, 12.) I denied his motion and gave him the opportunity to proceed on the two exhausted claims or to dismiss his entire petition. (Docket # 16.) Green proceeded on his two exhausted claims and the parties have briefed these grounds.

## STANDARD OF REVIEW

Green's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Green raises two grounds for relief: (1) that he was convicted on insufficient evidence and (2) that his conviction should be overturned in the interests of justice. I will address each argument in turn.

### *1.    Sufficiency of the Evidence*

Green argues that his conviction for first-degree reckless homicide cannot stand because there was insufficient evidence to show utter disregard for human life. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When insufficiency of evidence is asserted as the basis for a habeas petition, the petitioner must show "'upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt.'" *Cabrera v Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 324 (1979)). The inquiry does not require the federal habeas court to "ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Woodby v. INS*, 385 U.S. 276, 282 (1966)). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

A federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *See Jackson*, 443 U.S. at 324 n.16. Under Wisconsin law, a person commits first-degree reckless homicide when he "recklessly causes the death of another human being under circumstances which show utter disregard for human life." Wis. Stat. § 940.02(1). Green only challenges the sufficiency of the evidence as to the "utter disregard for human life" element.

In considering Green's sufficiency argument, the Wisconsin Court of Appeals used a standard consistent with *Jackson*. While the court of appeals did not cite to *Jackson*, it cited to *State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990), which pronounces a state law standard that is the functional equivalent to *Jackson*:

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.

153 Wis. 2d at 507, 451 N.W.2d at 757–58 (1990) (internal citation omitted). (Docket # 19-5 at 10.) As such, the court of appeals identified the correct governing legal rule. Thus, the only issue to resolve on habeas review is whether the state court unreasonably applied that rule to the facts of Green's case or unreasonably determined the facts in light of the evidence presented. In making that determination, it is important to recall that in a federal habeas corpus proceeding, the court's review is tempered by AEDPA's deferential constraints.

In arguing before the court of appeals that he was convicted on insufficient evidence, Green relied principally on *State v. Miller*, 2009 WI App 111, 320 Wis. 2d 724, 772 N.W. 2d

188 in support of his position that the State failed to prove that his conduct showed utter disregard for human life. (Docket # 19-5 at 15.) In its decision, the court of appeals distinguished the facts of Green's case from those in *Miller*. The court of appeals noted that unlike in *Miller*, Green resisted his friends' attempts to break up the fight, continued to engage Banks after the physical fight started, never attempted to leave the area or enlist the help of his friends to end the fight, and never warned Green that he had a gun and was prepared to shoot him. (*Id.* at 17.) The court of appeals noted that the jury could have believed the accounts of Gordon, Henderson, and Glover that Gordon and Henderson were attempting to stop the fight; could have accepted Gordon's and Henderson's testimony that Henderson was behind Banks when Green shot Banks over Gordon's shoulder; could have discounted Green's insistence that Banks was coming at him (especially since he did not tell the detectives this fact immediately after it happened); and could have accepted Gordon's and Henderson's testimony that Banks was in a boxing stance but not advancing on Green when he was shot. (*Id.* at 17–18.)

The crux of Green's argument is his disagreement with how the court of appeals distinguished *Miller* and his insistence that he was acting in self-defense. (Petitioner's Br. at 10–22, Docket # 24.) He acknowledges that while "[a]ny of the inferences" the court of appeals noted "could have been accepted by the jury," none of the inferences "overcome the physical evidence, the reasonableness of Green's belief at the time of the act, or the multi-factored test set forth in *Miller*." (*Id.* at 16.) He further argues that "If the court had relied on the multi-factored test referred to in *Miller*, it would have come to a different conclusion on whether Green showed any regard." (*Id.* at 18.)

Green misunderstands the test on habeas review. On habeas review, the task is not to determine whether the court of appeals properly applied *Miller*. The issue is whether the court of appeals properly applied *Jackson*. Again, all that *Jackson* requires is that, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The court of appeals found that the evidence "supports the charge of first-degree reckless homicide" as "Green was engaged in a brief fist fight, with his friends trying to intercede, including one of his friends protecting Green by placing himself between Green and Banks, when Green, without retreating and without warning, pulled out his gun and shot Banks in the head from a relatively short distance." (Docket # 19-5 at 18.) The court of appeals noted that while it was commendable that Green called 911 and remained at the scene afterward, the circumstances nevertheless supported a finding of "utter disregard for human life" because "death was a near certainty given the locations of Green and Banks, and the fact Green shot Banks in the head." (*Id.*)

The jury was instructed on self-defense and how self-defense weighs into whether the elements of first- or second-degree reckless homicide were present. (Docket # 19-13 at 5.) After hearing the evidence, the jury convicted Green of first-degree reckless homicide. While Green argues that the medical examiner's testimony regarding the trajectory of the bullet comports most closely to Green's testimony and makes it "impossible for Gordon to be directly between Banks and Green with Green shooting over Gordon's shoulder," (Docket # 24 at 16–17, 22) the medical examiner specifically testified that she could not definitively state, based on the bullet's trajectory, where the gun was located when it fired (Docket # 19-11 at 128–29). While Green disagrees with how the jury weighed the

evidence, it is the jury, not the court on habeas review, that determines the credibility of the witnesses' testimony. *See Chandler v. Richards*, 935 F.2d 915, 918 (7th Cir. 1991); *see also Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."). As the court of appeals explained, while there was conflicting evidence, there was nevertheless sufficient evidence presented to the jury, if believed, to convict Green of first-degree reckless homicide. Accordingly, Green has not shown the court of appeals unreasonably applied *Jackson*. For these reasons, he is not entitled to habeas relief on this ground.

### 2. *Interests of Justice*

In his habeas petition, Green alleges that he is entitled to a new trial in the interest of justice because the jury was never told that imperfect self-defense would negate a finding of "utter disregard for human life" and the evidence supported a finding that Green believed he needed to use a firearm. (Docket # 1 at 7.) Green alleges that the lack of this instruction deprived him of his constitutional right to a fair trial by jury. (*Id.*) In his brief, Green's argument shifts, arguing that the self-defense instructions were confusing to the jurors, improperly shifted the burden of proof, misled the jury, and created a mandatory presumption. (Docket # 24 at 26.) Green acknowledges that while the allegedly erroneous jury instruction "was not cast in terms of a constitutional violation," it had "constitutional implications" and thus is cognizable in federal habeas review. (*Id.* at 23.) The respondent argues that Green did not fairly present this issue as a constitutional claim before the state court; thus, he procedurally defaulted the claim. (Resp.'s Br. at 20–23, Docket # 26.) I agree.

A federal court may not entertain a petition from a prisoner being held in state custody unless the petitioner has exhausted his available state remedies prior to seeking federal habeas relief. *See* 28 U.S.C. § 2254(b); *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008). "This so-called exhaustion-of-state-remedies doctrine serves the interests of federal-state comity by giving states the first opportunity to address and correct alleged violations of a petitioner's federal rights." *Lieberman v. Thomas*, 505 F.3d 665, 669 (7th Cir. 2007). Inherent in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus is the duty to fairly present his federal claims to the state courts. *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004).

For a constitutional claim to be fairly presented to a state court, both the operative facts and the controlling legal principles must be submitted to that court. *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992). Whether a petitioner has done so depends on several factors, including: (1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004) (internal quotation and citation omitted).

Green's submissions before the Wisconsin Court of Appeals show that Green sought a new trial "in the interests of justice" pursuant to Wis. Stat. § 752.35 because the jury was not instructed on imperfect self-defense and the jury was not given the full picture of Green's fear of Banks. (Docket # 9-2 at 21–28; Docket # 9-4 at 11–14.) Whether Green is entitled to a new trial pursuant to Wis. Stat. § 752.35 is an issue of state law and was treated as such

before the Wisconsin Court of Appeals. (Docket # 19-5 at 18–20.) Whether a defective jury instruction violated Green's due process rights under the Fourteenth Amendment is a fundamentally different question. For these reasons, Green did not fairly present his due process argument to the Wisconsin courts and thus has procedurally defaulted the claim. *Braunreiter v. Krenke*, 125 F. Supp. 2d 1121, 1127 (E.D.Wis. 2000) ("[A] federal habeas petitioner may procedurally default her federal law claim if she does not first fairly present the substance of the federal claim to the state courts.").

A procedural default will bar federal habeas relief unless the petitioner can demonstrate both cause for and prejudice stemming from that default or he can establish that the denial of relief will result in a miscarriage of justice. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). To establish cause for his default, a petitioner ordinarily must show that some external impediment blocked him from asserting his federal claim in state court. *Perruquet v. Briley*, 390 F.3d 505, 514–15 (7th Cir. 2004) (citing *Murray v. Carrier*, 477 U.S. 478, 488, 492 (1986)). To show prejudice, a petitioner must present evidence that the errors at trial "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 515 (quoting *United States v. Frady*, 456 U.S. 152 (1982) (emphasis omitted)). The fundamental miscarriage of justice exception requires a showing that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (citation omitted).

Green does not attempt to show the cause and prejudice exception, but argues that denial of relief will result in a miscarriage of justice. (Petitioner's Reply Br. at 12, Docket # 29.) Green argues that the jury was improperly instructed as to self-defense and if the jury

had been properly instructed, they would not have convicted him of first-degree reckless homicide. (*Id.* at 12–13.) The crux of Green's argument is that the jurors were given conflicting instructions because on the one hand, they were told not to make a "separate finding" on self-defense, while at the same time were told that self-defense was an issue in the case. (Docket # 24 at 24–25.) Green further argues that the court improperly instructed the jury that the only way to find Green not guilty is if he proved that he acted in self-defense. (*Id.* at 25.)

Green is correct that the trial court clearly misspoke at one point in instructing the jury. Specifically, in one instance, the trial court said "the defendant" when it should have said the State:

> Because the law provides that it is the State's burden of proof to prove all the facts necessary to constitute crime beyond a reasonable doubt, you will not be asked to make a separate finding on whether the defendant acted in self-defense. Instead, you will be asked to determine whether the State has established the necessary facts to justify a finding of guilty of first or second-degree reckless homicide.
>
> If **the defendant** has not satisfied you that those facts are present or established by the evidence, you'll be instructed to find the defendant not guilty.

(Docket # 19-13 at 5–6) (emphasis added). Despite this error, the court later instructs the jury on self-defense as follows:

> You should consider the evidence relating to self-defense in deciding whether the defendant's conduct showed utter disregard for human life.
>
> ***
>
> As I stated to you -- stated to you, self-defense is an issue in this case. The law of self-defense allows the defendant to threaten or intentionally use force against another only if the defendant believed that there was an actual or imminent unlawful interference with the defendant's person, and the defendant believed the amount of force the defendant used or threatened to

18

use was necessary to prevent or terminate the interference and the defendant's beliefs were reasonable.

The defendant may intentionally use force which is intended or likely to cause death or great bodily harm only if the defendant reasonably believed that the force used was necessary to prevent imminent death or great bodily harm to himself.

A belief may be reasonable even though mistaken. In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense.

The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of the jury now.

There is no duty to retreat; however, in determining whether or not the defendant reasonably believed the amount of force used was necessary to prevent or terminate the interference, you may consider whether the defendant had the opportunity to retreat to safety, whether such retreat was feasible, and whether the defendant knew of the opportunity to retreat.

The State must prove by evidence which satisfies you beyond a reasonable doubt that the defendant did not act lawfully in self-defense.

If you are satisfied beyond a reasonable doubt that the defendant caused the death of Ernest Banks by criminally reckless conduct and the circumstances of the conduct showed utter disregard for human life, and the defendant did not act lawfully in self-defense, you should find the defendant guilty of first-degree reckless homicide.

If you are not so satisfied, you must not find the defendant guilty of reckless homicide, and you should consider whether or not the defendant's guilty of second-degree reckless in violation of the Criminal Code of Wisconsin, which is a lesser included offense of first-degree reckless homicide.

(*Id.* at 7–9.) On this record, the trial court did not shift the burden on Green to show that he needed to prove self-defense beyond a reasonable doubt, as Green suggests. (Docket # 24 at 27.) Rather, the court explicitly instructed that it was the State's burden to prove, beyond a

reasonable doubt, that Green did not act in self-defense. Green has not shown that denial of relief will result in a miscarriage of justice.

For these reasons, his second ground for relief is barred by procedural default.

## CONCLUSION

The circumstances underlying Green's conviction are tragic. As Green aptly sums up, his case involved the shooting of a man over "no-one-knows-what." (Docket # 24 at 1.) Despite Green arguing to the jury that he acted in self-defense, the jury convicted him of first-degree reckless homicide while armed. The court of appeals reasonably found that sufficient evidence supported the element of "utter disregard for human life." Further, Green procedurally defaulted his interests of justice claim by failing to fairly present it as a constitutional issue before the state courts and failed to demonstrate an exception to excuse the default. For these reasons, Green's petition for a writ of habeas corpus is denied.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

When issues are resolved on procedural grounds, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Each showing is a threshold inquiry; thus, the court need only address one component if that particular showing will resolve the issue. *Id.* at 485.

Jurists of reason would not find it debatable that Green is not entitled to habeas relief. Thus, I will deny Green a certificate of appealability. Of course, Green retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.


Dated at Milwaukee, Wisconsin this 2nd day of October, 2019.


BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge